## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| NEGHASI MIDDLETON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:18-cv-05099-MHC |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFF MIDDLETON'S OPPOSITION** |
| COBB COUNTY, GEORGIA, *et al.*, | ) | **TO DEFENDANTS'** |
| | ) | **MOTION TO DISMISS UNDER FED. R.** |
| Defendants. | ) | **CIV. P. 12(B)(6)** |
| | ) | |

## I.  INTRODUCTION

The story is all too familiar: an *unarmed*, black teenager is shot by a white police officer who suspected the boy of committing a crime he didn't commit. The main difference between this case and most others of national notoriety is that the officer shot Plaintiff Neghasi Middleton from *behind* while he was running *away*—in the middle of an otherwise quiet, residential cul-de-sac. Defendant James Elliott was in no danger when he shot at Elliott eight times; nor did he have reason to believe that the unarmed boy fleeing on foot posed a danger to others. (Nor does the video Defendants' submit depict any such danger.) And the crime Elliott suspected Middleton of committing didn't occur in Elliott's presence; nor, under Georgia law, did it necessarily involve violence or force.

Because Elliott had no probable cause to believe that Middleton posed a "threat of serious physical harm" to him or others, or that Middleton committed a "crime involving the infliction or threatened infliction of serious physical harm." his use of deadly force violated Middleton's clearly established Fourth and Fourteenth Amendment rights. And because Cobb County, through its police chief, Defendant John Houser, turned a blind eye toward the department and Elliott's well-chronicled history of discriminatory, unconstitutional conduct, it too violated Middleton's rights. As explained below, this Court should deny Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6).

II.   THE COMPLAINT'S FACTUAL ALLEGATIONS

On the morning of November 6, 2016, Middleton and three other individuals were sitting inside a parked car on a residential street. (Doc. 1, ¶¶ 2, 20, 21.) Middleton was in the driver's seat. (Doc. 1, ¶ 18.) Elliott was dispatched to a location regarding a report of a suspicious car parked on the street. (Doc. 1, ¶ 19.) Elliott's body camera was turned on as he left his car and audio and visual footage of the entire incident, including the shooting is available. (Doc. 1, ¶ 26.) Defendants attach a copy of the video to their motion as Exhibit 1.

Elliott found the car contained two juvenile females and two juvenile males. (Exhibit 1, 10:12:20; Doc. 1, ¶ 20.) The teens, including Middleton, responded to Elliott's questioning and, as he requested, wrote their names and dates of birth on

a notepad he gave them. None were armed or presented any danger. (Doc. 1, ¶ 21; Doc. 9-1, Ex. 1, 10:12:40.) After speaking with the teens, Elliot walked to the back of the car, obtained the license plate number, and then returned to his patrol car. (Doc. 1, ¶ 22; Doc. 9-1, Ex.1, 10:14:56.) While in his car, Elliot learned the car was involved in a carjacking and requested a "Code 74." (Doc. 9-1, Ex. 1, 10:15:12–10:15:33.) Elliott returned to teens with his service weapon drawn and commanded the teens to get out and on the ground. (Doc. 1, ¶ 22; Exhibit 1, 10:15:38–10:15:50.)

Middleton, an unarmed, young African-American male, and in fear for his life because of the reports of killings of black boys by police across America, left the car as instructed. But he fled on foot away from Elliott as fast as he could, desperate to reach the safety of his nearby home, which he shared with his mother and twin sister. (Doc. 1, ¶ 23) Without calling for or waiting for backup, Elliott sprinted after Middleton, leaving the other three juveniles unattended, and—without provocation or any real or perceived threat from Middleton—repeatedly fired his service weapon at Middleton's back as he fled through a residential subdivision, striking homes, street signs and other structures within the neighborhood. (Doc. 1, ¶ 24.) Elliott's barrage of gunfire placed Middleton in sheer terror for his life. After the first shot, Elliott fired seven more shots toward Middleton's back, eventually striking Middleton in the rear of his leg with the

eighth shot while Middleton was standing in the middle of a residential cul-de-sac. (Doc. 1, ¶ 25; Doc. 9-1, Ex. 1, 0:16:20–10:17:02.)

Elliott and his fellow officers have a well-chronicled history of using excessive, unconstitutional force. Between September 15, 2014 and November 25, 2016, Elliott had three complaints filed against him by three black citizens, two of which involved Elliott's use of excessive force and a third complaining of his racial bias. (Doc. 1, ¶¶ 42–45.) Despite the similarities in these complaints, the department's internal-affairs division recommended no sanctions against Elliot. (Doc. 1, ¶ 48.) Nor did the internal-affairs division recommend any additional training for Elliott. (*Id*.). Defendant Houser knew the nature of the complaints against Elliott, but, like internal affairs, did nothing to address them. (Doc. 1, ¶ 50.) Houser failed to train police officers, including Elliott, on the proper standards and procedures for detaining minor citizens and using deadly force against them. (Doc. 1, ¶ 55.) Houser knew that the Department's police officers, including Elliott, had a prevalent and pervasive history of using excessive force, particularly against black citizens and juveniles, and did nothing to train, supervise, or discipline them. (Doc. 1, ¶¶ 101–02, 107.)

In 2016, Defendant Cobb County commissioned a comprehensive report from the International Association of Chiefs of Police, evaluating the police

department's policies, procedures, and practices. (Doc. 1, ¶ 59.) The report urged

the county to address the "perception of discriminatory and bias[ed] policing":

> Cobb County Police Department leadership must recognize
> that the root cause of the strained relationships and lack of
> public trust with some members of the community, is the result
> of public perceptions of racism on the part of police officers and
> the agency as a whole. Cobb County Police Department
> leadership must develop a strategy to correct that perception,
> identify current practices that feed this perception, and
> immediately modify/eliminate those practices.

(*Id.*, ¶¶ 60, 62.) Only *after* Middleton's shooting and after Houser was gone did the

new chief made "changes in training…to address some of the issues associated

with [Middleton's shooting] which will assist officers in the future to make better

decisions when faced with similar situations." (*Id.*, ¶ 66.)[1]

## III.   ARGUMENT

At the motion to dismiss stage, the court accepts all the well-pleaded facts

in the plaintiff's complaint as true, as well as all reasonable inferences drawn

from those facts. *McGinley v. Houston*, 361 F.3d 1328, 1330 (11th Cir. 2004). Not

only must the court accept the well-pleaded allegations as true, they must be

construed in the light most favorable to the pleader. *Powell v. Thomas*, 643 F.3d

1300, 1302 (11th Cir. 2011). Defendants must prove that Middleton's complaint

---

[1] Defendants' reference to a grand-jury no-bill against Elliott is irrelevant. Middleton was not a party to that secret proceeding. Besides being outside of the Complaint, the prosecutor and grand jury's decisions have no claim- or issue-preclusive effect.

does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). They haven't met that burden here.

### A.    Defendant Elliott is not entitled to qualified immunity because his use of deadly force against Middleton violated Middleton's clearly established Fourth Amendment rights.

Qualified immunity protects government officials sued in their individual capacities only if their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Under 42 U.S.C. § 1983, an officer is only qualifiedly immune for alleged excessive force if "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638–41 (1987)).

To overcome qualified immunity, a plaintiff must show that the government official violated a constitutional right and, that, at the time of the violation, the right was "clearly established." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Eleventh Circuit has emphasized that "the cornerstone of qualified immunity" is "*fair and clear notice* to government officials" that their conduct is unconstitutional. *Marsh v. Butler Cnty., Ala.*, 268 F.3d

1014, 1031 (11th Cir. 2001) (*en banc*) (emphasis added). Defendants Elliott and Houser don't meet these tests for qualified immunity.

> **1.    Elliott's deadly force was objectively unreasonable, violating Middleton's Fourth Amendment rights.**

The Fourth Amendment protects the "right of the people to be secure in their persons…against unreasonable…seizures…" U.S. Const., Amend. IV.; *see also Wolf v. Colo.*, 338 U.S. 25, 27–28 (1949) (Fourth Amendment applies to the states through the Due Process Clause); "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." "[T]he use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tenn. v. Garner*, 471 U.S. 1, 7 (1985).

Gauging a seizure's reasonableness requires balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 8 (quoting *U.S. v. Place*, 462 U.S. 696, 703 (1983)). Naturally, "reasonableness depends on not only when a seizure is made, but also how it is carried out." *Id.* The "intrusiveness of a seizure by means of deadly force is unmatched" and, therefore, no government or law enforcement interest is "sufficient[]" to "justify" using such force against "*nonviolent* suspects." *Id.* at 9–10.

*Garner* held "a police officer may use deadly force to seize a fleeing felony suspect when the officer: (1) 'has probable cause to believe that the suspect poses

a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (quoting *Garner*, 471 U.S. at 11–12).

Even if the third factor were satisfied, *i.e.*, that Elliott warned Middleton about the possible use of deadly force, the Complaint's allegations and the body-cam footage attached to Defendants' motion as Exhibit 1 show the first two factors are not. Elliott had no probable cause to believe either that Middleton posed a threat of serious harm to him or others *or* that he had committed a crime involving the actual or threatened infliction of serious physical harm. Nor was Elliott's use of deadly force reasonably necessary to prevent Middleton's escape.

The Fourth Amendment's "objective reasonableness" test requires a court to "see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333–34 (11th Cir. 2004).

But that is not what happened here. Elliott was not forced to make a "split-second decision" in "circumstances where inaction could prove fatal." Rather,

after chasing the unarmed Middleton on foot for over a minute, Elliott stopped, gathered him in his sights, planted his feet, raised his weapon, aimed it, and shot Middleton *from behind* in the middle of a residential cul-de-sac at least 100 feet away. (Doc. 9-1, Ex. 1, 10:15:50–10:17:03.) Elliott could have easily called and waited for backup *before* he escalated the situation by jumping out of his vehicle to get four people, who were *calmly and patiently* waiting inside the vehicle, outside of the vehicle. Elliott's didn't make a "split-second" to use deadly force—and it was objectively *unreasonable.*

> a. **Elliott had no probable cause to believe that Middleton posed "a threat of serious harm to him or others."**

On this point, that Middleton was unarmed is critical. (Doc. 1, ¶¶ 1, 21; *see generally* Doc. 9-1, Ex. 1.) Nor at no point did he make any threatening remarks or gestures. (*See generally* Doc. 9-1, Ex. 1; Doc. 1, ¶ 21.) After exiting the car at Elliott's request, Middleton immediately fled *from* Elliott, *on foot*, without stopping or looking back. (Doc. 9-1, Ex. 1, 10:15:50–10:17:03.) Elliott then endangered the public when he wildly and frantically fired seven shots in Middleton's direction while chasing him on foot through a residential neighborhood. (*Id.*) The eighth and final shot struck Middleton in the rear of his left thigh, causing the boy to immediately collapse in the middle of a residential cul-de-sac. (*Id.* at 10:17:03.)

That Middleton fled from Elliott *on foot* further lends itself to the conclusion that Elliott's use of deadly force was objectively unreasonable. This case, therefore,

must be contrasted with those involving dangerous, high-speed vehicular chases. For example, in *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), the Eleventh Circuit found no Fourth Amendment violation when officers shot a suspect at the end of a 15-minute, high-speed car chase, mainly because the suspect had stopped for a matter of seconds and was still behind the wheel. "By the time of the shooting," the Court reasoned, "[the plaintiff] had used the automobile in a manner to give reasonable policemen probable cause to believe that it had become a deadly weapon with which [the plaintiff] was armed." 283 F.3d at 1282 (alterations added). Similarly, in *Scott v. Harris*, 127 S. Ct. 1769 (2007), the Supreme Court found no Fourth Amendment violation when a police officer rammed his vehicle into a fleeing suspect's vehicle after the suspect led police on a lengthy, high-speed chase. 127 S. Ct. at 1779. "[T]he car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others" and "no reasonable jury could conclude otherwise." *Id.* The Eleventh Circuit in *Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007) similarly found a police officer's use of deadly force to be reasonable when the plaintiff "was mentally unstable" and "had taken control of…a *police* cruiser." *Id.* at 580–81 (emphasis in original); *see also Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (finding officer's use of deadly force reasonable where officer "had probable cause to believe that

the [plaintiff's] truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves").

The Supreme Court's *Garner* decision is especially instructive because the facts are similar to these. Garner was an unarmed teenager standing about 5'6" to 5'8" tall. 471 U.S. at 4. Police responded to a burglary complaint and found Garner at the scene. *Id.* Garner fled on foot and attempted to climb over a fence when one officer— to prevent the boy's escape—shot him in the back of the head. *Id.* The officer admitted that, before shooting Garner, he saw no weapon and "figured" Garner was unarmed. *Id.* The Court held that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12. The Court concluded the officer's deadly force against Garner was unreasonable under the circumstances.

Unlike the cases cited above involving fleeing vehicles, Middleton's flight on foot posed no "threat of serious physical harm"—or *any* physical harm—to Elliott, himself, or any other citizen, especially because Middleton was unarmed. This case is more akin to *Garner* insofar as Middleton, like Garner, was an unarmed juvenile fleeing on foot when Elliott shot him from behind. Because Middleton, like Garner, did not pose a "threat of serious physical harm" to Elliott or anyone

else, and because Elliott was merely trying to prevent Middleton's escape, Elliott's use of deadly force was objectively unreasonable under the circumstances.

> **b.** **Elliott had no probable cause to believe that Middleton had committed "a crime involving the infliction or threatened infliction of serious physical harm."**

Defendant Elliott seeks to justify using deadly force with the conclusory claim that he had probable cause to believe Middleton committed a "forcible felony," namely, Hijacking a Motor Vehicle. (Doc. 9-1, p. 13.) But first, Elliott had no probable cause to believe Middleton committed the crime of "Hijacking a Motor Vehicle." Second, "Hijacking a Motor Vehicle," under Georgia law, has two separate definitions and is not necessarily "a crime involving the infliction or threatened infliction of serious physical harm."

Defendants' argument falters at its first step insofar as it assumes, without explanation, that the facts at Elliott's disposal gave him probable cause to believe Middleton committed the crime of "Hijacking a Motor Vehicle." Probable cause exists when "'the facts and circumstances within the officer's knowledge…would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Lee v.*

*Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)).[2]

These were the "facts and circumstances" Elliot knew when he shot the teen:

(1)    Middleton's name and age (Doc. 1, ¶ 21);

(2)    Middleton was in the driver's seat of a parked car (Doc. 1, ¶ 19);

(3)    the car was reportedly carjacked (Doc 9-1, Ex. 1, 10:15:12–10:15:33);

(4)    Middleton was unarmed (Doc. 1, ¶ 27; Doc. 9-1, Ex. 1, 10:15:50–10:17:03); and

(5)    Middleton left the car as Elliott instructed him, then attempted to flee on foot through a residential neighborhood (Doc. 9-1, Ex. 1, 10:15:50–10:17:03.)

But Elliott did *not* know two crucial facts: how Middleton came into possession of the reportedly stolen car and when.

Given these known and unknown facts, Elliott could not have reasonably believed that Middleton committed the crime of "Hijacking a Motor Vehicle." The Georgia Code defines "Hijacking a Motor Vehicle" as follows:

A person commits the offense of hijacking a motor vehicle in the first degree when such person while in possession of a firearm or weapon obtains a motor vehicle from an individual or the presence of another individual by force and violence or intimidation or attempts or conspires to do so.

*****

[2]  Although Defendants insist that there was probable cause that Middleton committed the offense of Hijacking a Motor Vehicle, he was *neither arrested* for that offense at the scene, nor has he *ever* been charged with this offense. And for good reason. There is no evidence he committed such an offense. He was charged with only theft by receiving.

> A person commits the offense of hijacking a motor vehicle in the second degree when such person obtains a motor vehicle from an individual without his or her consent or from the immediate presence of another individual without his or her consent or attempts or conspires to do so.

O.C.G.A. 16-5-44.1(b)(1) and (b)(2). As to the first provisions, Elliott had no reason to believe, when he shot Middleton, that Middleton—while in possession of a firearm or weapon—stole the car he was in by "force or violence": (1) Elliott didn't witness the alleged crime; (2) Elliott didn't know whether Middleton obtained the car in the owner's presence; and (3) Elliott knew Middleton was unarmed. As to the second provision, Elliott had no reason to believe that Middleton obtained the car from the alleged owner, in the owner's presence, and without the owner's consent. Again, this is because Elliott didn't witness the alleged taking and had no idea how Middleton came into possession of the reportedly stolen car or whether the owner was present when, and *if*, Middleton took it.

Elliott may have had probable cause to believe Middleton committed either "Theft by Taking"[3] or "Theft by Receiving Stolen Property"[4] insofar it is permissible to conclude that the person in the driver seat of a reportedly stolen

---

[3] "A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." O.C.G.A. 16-8-2.

[4] "A person commits the offense of theft by receiving stolen property when he receives, disposes of, or retains stolen property which he knows or should know was stolen unless the property is received, disposed of, or retained with intent to restore it to the owner. "Receiving" means acquiring possession or control or lending on the security of the property." O.C.G.A. 16-8-7(a).

vehicle either stole the vehicle himself or knows it to be stolen. But as both crimes clarify, neither requires "the infliction or threatened infliction of serious physical harm" and so neither justified Elliott's use of deadly force against Middleton.

But even if Elliott had probable cause to believe Middleton committed the crime of "Hijacking a Motor Vehicle," that crime does not necessarily involve "the infliction or threatened infliction of serious physical harm." "Hijacking a Motor Vehicle" in the second degree, unlike the same crime in the first degree, does not require the actual or threatened use of force or violence. All that is required is the owner's presence and lack of consent. *Compare* O.C.G.A. 16-5-44.1(b)(1) *with* O.C.G.A. 16-5-44.1(b)(2). Because the Complaint says nothing about "Hijacking a Motor Vehicle" in the first degree, this Court cannot conclude the Complaint alleges Elliott had probable cause to believe Middleton committed a crime involving "the infliction or threatened infliction of serious physical harm." The facts Elliott's knew when he shot Middleton would undermine such a conclusion. On a motion to dismiss, all inferences must be resolved in Middleton's favor.

### c.   Elliott's use of deadly force was unnecessary to prevent Middleton's escape.

Whether an officer *reasonably* believes using deadly force was necessary to prevent a suspect's escape is another factor in determining "objective reasonableness" under the Fourth Amendment. *Vaughan*, 343 F.3d at 1329–30; *Garner*, 471 U.S. at 11–12.  This factor tips the scale toward Middleton.

Again, when Elliott when pulled the trigger, he knew Middleton's name and age, he knew Middleton was unarmed, and he knew Middleton was fleeing on foot. He knew—or reasonably *should have known*—that Middleton couldn't escape for long. Elliott had called for back-up assistance and, throughout the chase, communicated with other officers through his radio. (*See generally* Doc. 9-1, Ex. 1.) Elliott escalated this situation by not waiting for backup to arrive at a scene he *already had under control*. Neither Middleton nor the car's occupants were resisting or attempting to flee before Elliott's actions.

The Eleventh Circuit's *Vaughan* decision is instructive. *Vaughan* involved an officer's use of deadly force against a fleeing motorist. The court concluded that "a reasonable jury could find…Deputy Cox's use of deadly force was not necessary to prevent escape." *Vaughan*, 343 F.3d at 1330–31. This conclusion was premised, in part, on "evidence that…the truck, with trailer in tow, was easily identifiable and could have been tracked, and that the officers could have sought assistance from other jurisdictions to follow the suspects." *Id.* at 1331.

*Vaughan*'s rationale applies equally here and leaves open the possibility that a reasonable jury could conclude Elliott's use of deadly force was unnecessary to prevent Middleton's escape. Like the fleeing suspect in *Vaughan*, Middleton here was "easily identifiable." He had identified himself. Given that Elliott constantly communicated with other officers, Middleton "could have been tracked" and

Elliott "could have sought assistance" from those other officers to follow and apprehend Middleton. The bottom line: Elliott's use of deadly force against an unarmed juvenile fleeing on foot was wholly unnecessary.

>    2.    **Middleton's Fourth Amendment right to be free from deadly force while fleeing on foot and not posing a threat of serious physical harm to Elliott or others was "clearly established."**

"The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted." *Vinyard*, 311 F.3d at 1350 (emphasis in original). This analysis "'must be undertaken in light of the specific context of the case [and] not as a broad general proposition.'" *Lee*, 284 F.3d at 1194 (quoting *Saucier*, 121 S. Ct. at 2156).

There are typically two ways a plaintiff can show that the constitutional right at issue was "clearly established" at the time of the violation. The first way is by reference to "broad statements of principle in case law." *Id.* at 1351. Though these "broad statements" of law may not be tethered to "particularized facts," they, nevertheless, can "clearly establish law applicable in the future to different sets of detailed facts." *Id.* "And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's

conduct did violate federal law when the official acted." *Id.* The second way a constitutional right can be "clearly established" is by looking at precedent tied to specific facts. As the Eleventh Circuit observed in *Vinyard*, "if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law." *Id.* at 1352.

The constitutional right at issue is as follows: the right of an unarmed, non-violent felony suspect to be free from deadly force while fleeing a police officer on foot and not posing a threat of serious harm to the officer or others. This right, protected by the Fourth Amendment, was clearly established by November 2016 not just by binding "broad statements of law" but also by precedent with "materially similar" facts—specifically, the Supreme Court's *Garner* decision.

The "broad statements of law" in *Garner* and *Vaughan* applied with "obvious clarity" to the circumstances Elliott confronted. And Georgia law in November 2016 further supported the existence of this right and, under Supreme Court and Eleventh Circuit precedent, permitted police officers to

> use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.

O.C.G.A. 17-4-20(b).[5]

These legal principles applied to the circumstances Elliott faced in November 2016—over 30 years after *Garner*. Elliott had no probable cause to believe that Middleton was armed and dangerous, that he committed a violent felony, or that his flight on foot through a quiet, residential neighborhood posed a threat of "serious physical harm" to himself or anyone else. Nor did Elliott have good reason to believe that shooting Middleton was necessary to prevent his escape or effect his ultimate apprehension.

And *Garner*'s facts are "materially similar" to the facts here, underscoring Middleton's "clearly established" right not to be shot under the circumstances. The *Garner* suspect was unarmed and shot from behind by an officer while attempting to flee on foot. The officer who shot Garner had probable cause to believe Garner had committed only a *non-violent* felony. The Supreme Court thus held the officer's use of deadly force against Garner objectively unreasonable. *Garner* provided Elliott in November 2016 with more than "fair and clear notice" his use of deadly force violated Middleton's "clearly established" Fourth Amendment rights. Thus, Elliott has no qualified-immunity defense; his motion to dismiss should be denied.

---

[5] If Defendants claim the disjunctive "or" in this statute permits an officer to shoot someone based on probable cause alone, without immediate threats to safety, then the statute would be inconsistent with *Garner* and *Vaughan's* interpretation of the Fourth Amendment, and therefore unconstitutional.

**B.** **Defendant Houser is not entitled to qualified immunity because a causal connection exists between his supervisory conduct and Elliott's deprivation of Middleton's Fourth Amendment rights.**

A supervisor is liable under § 1983 for his subordinates' conduct if the supervisor either "personally participate[d] in the alleged unconstitutional conduct" or the existence of "a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). The required causal connection is shown if (1) a history of widespread abuse that would put the responsible supervisor on notice of the need to correct the alleged deprivation, and the supervisor's failure to correct the problem; (2) an official custom or policy that led to the violation; or (3) facts that indicate that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. *Id.* at 1360 (internal quotations and citations omitted).

**1.** **Houser knew of the department and Elliott's history of unconstitutional conduct and failed to stop them.**

As Middleton's complaint alleges, Elliott and other Cobb County officers have a well-chronicled history of using excessive, unconstitutional force. Between September 15, 2014 and November 25, 2016, Elliott had three complaints filed against him by three different black citizens, two of which involved Elliott's use of excessive force and a third complaining of his racial bias. (Doc. 1, ¶¶ 42–45.) Despite the similarities in these complaints, the internal-affairs division

recommended no sanctions. (Doc. 1, ¶ 48.) Nor did internal affairs recommend Elliott undergo additional training. (*Id.*) Even knowing about Elliott's history of citizen complaints, Houser—like internal affairs—did nothing to address them. (Doc. 1, ¶ 50.) Houser failed to train officers—including Elliott—on the proper standards for detaining minor citizens and using deadly force against them. (Doc. 1, ¶ 55.) Houser knew that the Department's officers, including Elliott, had a prevalent and pervasive history of using excessive force, particularly against black citizens and juveniles, and did nothing to train, supervise, or discipline them. (Doc. 1, ¶¶ 101–02, 107.)  And, as detailed above, Defendants knew that the report Cobb County commissioned from the police chiefs' association evaluating the Department's policies, procedures, and practices (Doc. 1, ¶ 59) urged Defendants to address the "perception of discriminatory and bias[ed] policing" (Doc. 1, ¶ 60, ¶ 62.)

Only *after* Middleton's shooting and *after* Defendant Houser was gone that the new chief made "changes in training…to address some of the issues associated with [Middleton's shooting] which will assist officers in the future to make better decisions when faced with similar situations." (Doc. 1, ¶ 66.) Drawing inferences in Middleton's favor—as the Court must—the chief's statement raises the inference that such training was needed before November 2016, and that Houser and other Cobb County officials likely knew about it and did nothing.

Middleton has, therefore, alleged sufficient facts to plausibly show Houser knew the Department's and Elliott's history of unconstitutional conduct and failed to correct the problem, leading to unfortunately shooting Middleton. Through his deliberate or reckless supervision of Elliott and other officers, Houser violated Middleton's Fourth Amendment rights and his motion to dismiss must be denied.

### C.     Middleton has stated a claim against Defendants Cobb County, Elliott, and Houser in their official capacities because the Complaint alleges an unconstitutional policy, practice, or custom.

Defendant Cobb County and Defendant Houser, in his *official* capacity, are liable to Middleton under § 1983 for substantially the same reasons Houser is liable in his individual capacity: they "knew of a need to train and/or supervise" the Department's officers on the lawful use of force and "made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Generally, § 1983 liability attaches to a municipal entity only "when execution of a government's policy or custom inflicts the injury…" *Monell v. Dept. of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978).  But where "a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants…such a shortcoming [may] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alterations added).

As detailed in the immediately preceding subsection—and drawing all inferences in Middleton's favor as the Court must—the Complaint recites allegations sufficient to show that Defendants Cobb County, Middleton, and Elliott, in their official capacities, had a custom, policy, or practice of unconstitutional policing.

Defendants claim that, under *Rizzo v. Goode*, 423 U.S. 362 (1976), an actionable policy or custom under § 1983 must be supported by "a significant number of deprivations and a 'common thread running through them.'" (Doc. 9-1, p. 20 (quoting *Rizzo*, 423 U.S. at 375).) But *Rizzo*, addressing injunctive, class wide relief under § 1983, was decided pre-*Monell*. No post-*Monell* case requires a "significant number of deprivations" to establish municipal liability under § 1983, and such a rule would create perverse incentives. *Monell* and its progeny impose no such numerosity requirement. *Rizzo* is, therefore, inapposite.

But even if *Rizzo* applied, the Complaint, as detailed above, alleges sufficient deprivations—with a common-enough thread running through them—to state a *Monell* cause of action against all official-capacity defendants. And the "discriminatory and bias[ed] policing" by the department documented by the police chiefs' association is reinforced by Lieutenant Greg Abbott's policy-and-practice admission to a fearful white passenger during a July 2016 traffic stop that "we [Cobb County police officers] only kill black people." (Doc. 1, ¶ 58.)

The Complaint thus states a claim for municipal liability under § 1983 and the Court should deny Defendants' motion to dismiss.

### D. "Official immunity" does not bar Middleton's state-law, individual-capacity tort claims against Elliott the deadly force against Middleton was with actual malice and intent to injure.

The Georgia Constitution provides public officials performing discretionary acts with immunity from state-law tort claims unless they performed those acts "with actual malice or with actual intent to cause injury." Ga. Const., Art. I, Sec. II, Par. IX (d); *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999). In *Kidd*, the Georgia Supreme Court assumed, for that appeal, that "actual malice" and "actual intent to cause injury" do not bear identical meanings. 518 S.E.2d at 125. The Court explained that "[t]he phrase 'actual intent to cause injury' has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Id.* (internal quotations and citations omitted); *accord Peterson v. Baker*, 504 F.3d 1331, 1339 (11th Cir. 2007). According to the *Kidd* Court, where a government official, exercising discretionary authority, shoots a person "intentionally and without justification, then they acted solely with the tortious 'actual intent to cause injury.'" *Id.*

Middleton alleges that Elliott's use of deadly force against him was discretionary, and that Elliott acted with "actual malice" *or* with "actual intent to cause injury." Drawing all inferences in Middleton's favor, as the Court must, for

Elliott to shoot at Middleton *eight times* — *i.e.*, to deprive him of his Fourth Amendment rights, shows "actual malice." And firing those shots shows "actual intent to cause injury." Because Elliott shot Middleton "intentionally and without justification," he acted "solely with the tortious actual intent to cause injury." *Kidd v. Coates*, 518 S.E.2d at 125. Middleton's state-law tort claims against Elliott are not barred by official immunity, and the Court should deny his motion to dismiss.

## IV.   CONCLUSION

Thus, Plaintiff Neghasi Middleton respectfully requests this Court deny Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6).

Respectfully submitted this 30th day of January 2019,

*/s/Tanya Miller*

Tanya F. Miller (GA Bar No. 508434)
Dubose Miller
75 14th NE, Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Miller@dubosemiller.com

## CERTIFICATE OF TYPE STYLE

This document was prepared using Book Antiqua 13-point font.

## CERTIFICATE OF SERVICE

A copy of the foregoing ***PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO DISMISS*** was served through the Court's electronic filing system this 30th  day of January, 2019. Notice of this filing will be sent to the parties by operation of the Court's electronic-filing system.

*/s/ Tanya F. Miller*_____
Attorney for Plaintiff Neghasi Middleton